1 | BROWNE WOODS GEORGE LLP
Eric M. George (No. 166403)
egeorge@bwgfirm.com
Michael A. Bowse (No. 189659)
mbowse@bwgfirm.com
2121 Avenue of the Stars, 24th Floor
Los Angeles, California 90067
Tel: 310.274.7100 -- Fax 310.275.5697

SMOGER & ASSOCIATES
Gerson H. Smoger (SBN 79196)
Gerson@texasinjurylaw.com
Steven M. Bronson (SBN 246751)
steven.bronson@gmail.com
3175 Monterey Blvd
Oakland, California, 94602-3560
Tel 510.531.4529 -- Fax 510.531.4377

ARBOGAST & BERNS
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Tel 818. 961.2000 -- Fax 818.867.4820

ANDRUS ANDERSON LLP
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Lori E. Andrus  (SBN 205816)
lori@andrusanderson.com
155 Montgomery Street, 9th Floor
San Francisco, California 94104
Tel 415.986.1400 -- Fax: 415.986.1474

Attorneys for Plaintiffs Laura Lyons and
Elaine Ruth Lee, on behalf of themselves
and all others similarly situated

CV10   5166

UNITED STATES DISTRICT COURT

ORIGINAL FILED

NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION

NOV 1 5 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LAURA B. LYONS and ELAIN
RUTH LEE, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.,

Defendant.

Case No.
Assigned to

**CLASS ACTION COMPLAINT FOR:**

1. Violation of CA Bus. & Prof. Code § 17200 et. seq.

2. Breach of Contract

3. Unjust Enrichment

4. Declaratory Relief

**JURY TRIAL DEMANDED**



ORIGINAL FILED

NOV 1 5 2010
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



FAXED
FIRST LEGAL SUPPORT SERVICES

262614_1.DOC

Plaintiffs Laura B. Lyons and Elaine Ruth Lee, on behalf of themselves and others similarly situated ("Plaintiffs"), as against JPMorgan Chase Bank, N.A. ("JPMorgan") allege as follows:

## SUMMARY OF THE CLAIMS

1.     This action arises out of JPMorgan's violations of California Business & Professions Code § 17200 et seq., breaches of contract, and unjust enrichment in connection with Plaintiffs' loans, which occurred after JPMorgan purchased those loans from the Federal Deposit Insurance Corporation, Receiver for Washington Mutual Bank (the "Receiver"). In addition, this action arises out of JPMorgan's ongoing assertion that Plaintiffs and many other of its borrowers each owe tens of thousands of dollars more on their home loans than they actually owe.

2.     Washington Mutual Bank ("Washington Mutual") sold option adjustable rate mortgage loans ("Option ARM loans") to thousands of homeowners in California and elsewhere. The loan documents for these loans promise that borrowers' payments will be applied each month to both principal and interest, and that an initial low interest rate (typically 1 or 2%) would apply for the first year or more.

3.     However, Washington Mutual never fulfilled these obligations set forth in the loan documents. Instead, it exploited the loan documents' intentionally vague language and asserted that it could treat Plaintiffs' loans as negative amortization loans. Thus, after inducing Plaintiffs to enter into these loans, Washington Mutual (i) employed an interest rate that was substantially higher than the promised low interest rate, (ii) applied Plaintiffs' monthly payments to only a portion of accrued interest and not to any principal, and (iii) treated Plaintiffs' loans as negative amortization loans. Because Washington Mutual incorrectly treated its Option ARM loans as negative amortization loans, it increased Plaintiffs' principal

1    balances even if Plaintiffs made monthly payments according to the payment
2    schedule provided to them.

3        4.    On September 25, 2008, after Washington Mutual collapsed,
4    JPMorgan purchased all of the Option ARM loans that Washington Mutual owned,
5    as well as the servicing rights and obligations for those loans. Among the loans
6    JPMorgan purchased were Plaintiffs' loans. JPMorgan was able to purchase these
7    loans for pennies on the dollar in large part because it, Washington Mutual, and the
8    FDIC Receiver knew that the way Washington Mutual had interpreted the loans'
9    terms would result in high default and foreclosure rates. Indeed, according to the
10   loans' terms, once the purported principal balances on the loans reach 110% or
11   115% of the original loan balance, JPMorgan can demand substantially higher
12   monthly payments from borrowers, including Plaintiffs. If Plaintiffs and the other
13   borrowers cannot make these payments, JPMorgan can foreclose upon and take
14   their homes.

15       5.    Since acquiring Plaintiffs' loans, JPMorgan has continued to enforce
16   the loans in precisely the same unlawful and unfair manner as Washington Mutual.
17   Specifically, for Plaintiffs' loans, JPMorgan is: (1) using an interest rate that is
18   substantially higher than the promised rate, (2) misapplying each monthly payment
19   to only a portion of interest and no principal, rather than to principal and interest,
20   and (3) treating Plaintiffs' loans as negative amortization loans. Moreover,
21   JPMorgan is asserting inflated principal balances on the loans, which serves only to
22   accelerate negative amortization and move the loans closer to the 110% or 115%
23   payment reset threshold and foreclosure.

24       6.    Therefore, since acquiring Plaintiffs' loans, JPMorgan has engaged in a
25   pattern of misconduct that has directly injured Plaintiffs. Indeed, it is only because
26   of JPMorgan's misconduct that Plaintiffs' loans are *guaranteed* to recast, that
27   Plaintiffs are going to be unable to make the enlarged monthly payments JPMorgan
28   demands, and that Plaintiffs face the threat of losing their homes.

1   7.   JPMorgan's misconduct includes:

2   a.   Breaching (and continuing to breach) its contractual obligation

3   to apply each of Plaintiffs' payments to all interest accrued for the month and to a

4   portion of the principal balance, by applying Plaintiffs' monthly payments to only a

5   portion of the monthly interest and to none of the principal.

6   b.   Breaching (and continuing to breach) its obligation to honor the

7   low interest rate promised to Plaintiffs.

8   c.   Unjustly enriching itself by improperly retaining the benefit of

9   Washington Mutual's misconduct, and unjustly retaining the benefit of its own

10  misapplication of Plaintiffs' monthly payments.

11

12  **THE PARTIES**

13  8.   Plaintiff- Laura Lyons is, and at all times relevant to this Complaint

14  was, an individual residing in Oakland, California.  On or about March 9, 2005, Ms.

15  Lyons refinanced her existing home loan and entered into an Option ARM loan

16  agreement with Washington Mutual Bank.  The Option ARM loan was secured by

17  Ms. Lyon's primary residence.  Attached hereto as <u>Exhibit 1</u> is a true and correct

18  copy of the Note supplied to Ms. Lyons by Washington Mutual.

19  9.   Plaintiff Elaine Ruth Lee is, and at all times relevant to this Complaint

20  was, an individual residing in Berkeley, California.  On or about July 21, 2005, Ms.

21  Lee refinanced her existing home loan and entered into an Option ARM loan

22  agreement with Washington Mutual Bank.  The Option ARM loan was secured by

23  Ms. Lee's primary residence.  Attached hereto as <u>Exhibit 2</u> is a true and correct

24  copy of the Note supplied to Ms. Lee by Washington Mutual.

25  10.   JPMorgan is, and at all material times relevant to this Complaint was,

26  a federally chartered bank doing business in California and throughout the United

27  States.  JPMorgan maintains its headquarters in Columbus, Ohio.  JPMorgan

28  presently owns and services the Option ARM loans that are the subject of this

262614_1.DOC                                            3

Complaint, including Option ARM loans originated, recorded and held in this District. JPMorgan transacts business throughout the United States, including in this District, and the activities complained of herein occurred, in whole or in part, in this District.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

12. Plaintiffs are citizens of California and JPMorgan is a citizen of Ohio and New York. The matter in controversy exceeds the sum or value of $5,000,000, as the controversy involves thousands of homeowners' loans.

13. This Court has personal jurisdiction over JPMorgan by virtue of the fact that it is registered to do business and does business in California.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because JPMorgan does business in this judicial district and a substantial part the events that give rise to this suit occurred here.

## GENERAL ALLEGATIONS

15. This action arises out of JPMorgan's violations of the UCL, breaches of its contractual obligations to Plaintiffs, and unjust enrichment.

**A.** **The Option ARM Loan Agreements**

16. The Option ARM loans issued to Plaintiffs by Washington Mutual, and subsequently purchased from Washington Mutual by JPMorgan, that are the subject of this Complaint are different from other loans issued by Washington Mutual and most banks. That is the case principally because the subject Option ARM loans were treated by Washington Mutual, and are now being treated by JPMorgan, in a manner that is certain to result in negative amortization, which

1   reduces borrowers' equity on their homes, even as they make the payments required

2   of them.

3       17.    That treatment, however, is contrary to the actual terms of the Loans.

4       18.    Each Note and the Truth-in-Lending Disclosure Statement ("TILDS")

5   supplied to Plaintiffs by Washington Mutual required Defendants to apply

6   Plaintiffs' and Class members' monthly payments to both principal and interest on a

7   fully-amortized basis (*i.e.*, so that negative amortization would not occur) as long as

8   those payments were in the amounts reflected in the Note and the TILDS. The

9   Notes and the TILDS identified the monthly payments Plaintiffs and the Class

10   members were required to make. Under the terms of the Note and TILDS, the

11   lenders were not permitted to impose or charge any different payment amount. As

12   alleged herein, the Notes expressly state and/or imply that those payments would be

13   applied to pay both principal and interest on the loan.

14       19.    Before obtaining their loans, each Plaintiff and each Class Member

15   submitted a "Master Loan Application" on a form provided by Washington Mutual

16   which constituted an offer to contract to be accepted or rejected by Washington

17   Mutual. Each of those Master Loan Applications reflected an interest rate –

18   typically between 1% and 3% – and a loan term – typically 360 months. For each

19   Plaintiff and each Class Member, Washington Mutual accepted the terms offered in

20   the Master Loan Application and provided a Note which repeated the interest rate

21   and loan term reflected in the Master Loan Application.

22       20.    The Notes state at Paragraph 3(A) that Plaintiffs would "pay Principal

23   and interest by making payments every month." This provision did not merely

24   mean that Plaintiffs would make payments every month. That obligation is stated

25   in the third sentence of Paragraph 3(A): "I will make my monthly payments on

26   <u>1st</u> day of each month beginning on <u>December, 2005</u> ." Nor does the first

27   sentence of Paragraph 3(A) mean that Plaintiffs would make monthly payments

28   until all of the interest and principal due on the loan were paid. That obligation is

262614_1.DOC                  5

described in the fourth sentence of Paragraph 3(A): "I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note." Rather, the first sentence of Paragraph 3(A) means that borrowers' payments would pay principal and interest each month.

21.    Also in Paragraph 3(A), the Note defines the term "payments" to mean "Principal and interest payments". Thus, each time the Note uses the term "payment", it means and was intended to mean <u>both</u> principal and interest.

22.    Paragraph 7(A) of the Note similarly identifies Plaintiffs' monthly payments as payments of "Principal and interest". There, the Note states that if Plaintiffs failed to make their payments on time, they would be required to pay a late charge equal to "5.000% of my overdue payment of Principal and interest." In the TILDS, Defendants confirmed that the payment of "Principal and interest" are the payments identified in the payment schedule. The TILDS states: "Late Charge: If a payment is late, you will be charged 5.000% of the payment." The only payments that statement could refer to are the specific payment amounts identified n the TILDS, each of which is to be made in specified months of the loan term.

23.    Paragraph 7(B) of the Note reaffirms that the monthly payments identified in the Note and TILDS are the monthly payments of "principal and interest" referred to in Paragraphs 3(A) and 7(A). There, the Note states: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default." At the time the Note was provided, the only monthly payments were those identified in the Note and the TILDS. This indicates that those payments were the full amount of Plaintiffs' legal liability under the Notes each month. Moreover, both Washington Mutual's and JPMorgan's subsequent conduct confirmed that, by paying monthly payments in the amounts identified in the payment schedule contained in the TILDS, Plaintiffs were paying "the full amount of each monthly payment". At no time did either bank declare Plaintiffs in default

262614_1.DOC                                    6

based upon their payment of the amounts identified in the payment schedule in the TILDS.

24.    In the Adjustable Rate Rider, which is incorporated into each borrower's Note, paragraph (F) provides that "the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment ...." (emphasis added). The Note contains similar language.

25.    Paragraph 3(A) of the Note also provides that "Each monthly payment will be applied to interest before principal." Thus, under the terms of the Note, for any portion of a monthly payment to be applied to principal, the payment first had to be applied by defendants to extinguish all of the interest that accumulated on the loan during that month. As a result, by promising that Plaintiffs' payments were payments of "Principal and interest," these loan documents necessarily promised that negative amortization would not occur if Plaintiffs made the monthly payments asked of them.

26.    The Option ARM loan terms described above were uniform for Plaintiffs and Class members in all material respects throughout the liability period.

**B.    JPMorgan's Purchase of Plaintiffs' and Class Members' Loans**

27.    On September 25, 2008, the Office of Thrift Supervision closed Washington Mutual Bank and appointed the FDIC as receiver.

28.    On the same day, the Receiver and JPMorgan entered into a Purchase and Assumption Agreement ("P&A Agreement") under which JPMorgan purchased, and the Receiver sold and assigned, all of Washington Mutual's assets. A true and correct copy of the P&A Agreement is attached hereto as Exhibit 2.

29.    Through the P&A Agreement, JPMorgan purchased: (i) all right, title and interest in the Option ARM loans which are the subject of this lawsuit, and (ii) all servicing rights and obligations for those loans.

30.    Specifically, the P&A Agreement states:

262614_1.DOC                    7

1            a.     JPMorgan "purchases from the Receiver, and the Receiver

2  hereby sells, assigns, transfers, conveys, and delivers to [JPMorgan], all right, title,

3  and interest of the Receiver in and to all assets ... of the Failed Bank whether or not

4  reflected on the books of the Failed Bank as of Bank Closing." (Ex. 2, P&A

5  Agreement ¶ 3.1.)

6            b.     JPMorgan "specifically purchases all mortgage servicing rights

7  and obligations of the Failed Bank." (*Id.*)

8      31.    By purchasing the Notes to Plaintiffs' loans, JPMorgan acquired

9  privity with Plaintiffs.

10     32.    In addition, the subject Option ARM loans that JPMorgan purchased

11  are non-negotiable instruments. As the purchaser of these non-negotiable

12  instruments, JPMorgan stands in the shoes of Washington Mutual, as the assignor,

13  taking Washington Mutual's rights and remedies, subject to any defenses that the

14  obligor (Plaintiffs) had against Washington Mutual prior to notice of the

15  assignment.

16     33.    Further, after purchasing the subject Option ARM loans, JPMorgan

17  also voluntarily accepted the benefit of the loan transaction between borrowers and

18  Washington Mutual. Thus, JPMorgan consented to all the obligations arising from

19  the subject Option ARM loan transactions.

20     34.    JPMorgan is also responsible for the loans and the improper methods

21  of accounting applied to them for another reason. Even before it purchased

22  Washington Mutual, JPMorgan was heavily involved in the operation of

23  Washington Mutual. In January 2005, JPMorgan's CEO sent several senior and

24  junior JPMorgan executives with knowledge of the home mortgage business to

25  infiltrate Washington Mutual. Among those executives were (1) Stephen J. Rotella,

26  executive vice president of Chase Home Finance, who joined Washington Mutual

27  as its president and chief operating officer, (2) Steve Fortunato, senior vice

28  president of Chase Home Finance, who joined Washington Mutual as an executive

1   responsible for mortgage servicing valuation, (3) Taj Bindra, Chief Financial

2   Officer and Vice President for Chase Home Finance, (4) John Berens, senior vice

3   president of default services for Chase Home Finance, (5) Youyi Chen, senior vice

4   president responsible for managing interest rate risk for Chase Home Finance

5   mortgage servicing rights, and (5) Bill Murray, responsible for mortgage servicing

6   rights valuation for JPMorgan's Capital Markets group.

7       35.    Then, after Washington Mutual rebuffed a 2008 offer by JPMorgan to

8   purchase Washington Mutual, JPMorgan pressured regulators to tighten their

9   oversight of Washington Mutual, all with an eye towards forcing the collapse or

10   sale of Washington Mutual.

11       36.    Pursuant to the Note, other loan documents and the servicing

12   obligations, JPMorgan is obligated to: (i) apply each monthly payment to all

13   interest accrued and a portion of principal, and (ii) honor the promised low interest

14   rate for the first year or more of the loan term.

15       37.    However, since acquiring Plaintiffs' Option ARM loans, JPMorgan has

16   breached these obligations by (i) applying each monthly payment to only a portion

17   of accrued interest and to no principal, (ii) using an interest rate that is substantially

18   higher than the promised low interest rate, and (iii) adding purportedly unpaid

19   interest to the principal balance and charging the higher than promised interest rate

20   to those portions of the principal balance as well.

21       38.    At the time JPMorgan purchased the subject loans, it knew that the

22   loans were *not* negative amortization loans, that Washington Mutual had been

23   failing to honor the promised interest rate, and that Washington Mutual had been

24   misapplying monthly payments to only a portion of interest, rather than to all

25   interest and some principal.. This misapplication of payments was of great benefit

26   to JPMorgan because, *inter alia*, (i) it purportedly provided JPMorgan with a larger

27   equity stake in Plaintiffs' homes than it otherwise would have had, (ii) it provided

28   JPMorgan with loans with inflated principal balances, (iii) it allowed JPMorgan to

1   demand a larger amount in payments from Plaintiffs than JPMorgan otherwise

2   would have been able to demand, (iv) it put the loans closer to the 110% or 115%

3   payment reset threshold, and (v) it made foreclosure, which would permit

4   JPMorgan to take title to Plaintiffs' homes, more likely.

5       39.    After purchasing Plaintiffs' loans, JPMorgan recorded in its own books

6   and records the inflated loan balances that had previously been asserted by

7   Washington Mutual, even though it knew the loan balances it was recording were

8   inflated.

9       40.    Similarly, as described above, since acquiring Plaintiffs' loans,

10   JPMorgan has benefited from its own misapplication of monthly payments.

11   Nevertheless, instead of correcting these misapplications, JPMorgan has retained

12   the benefit from them at Plaintiffs' expense.

13       41.    Also, as a result of its assertion of inflated principal balances on

14   Plaintiffs' and Class Members' loans, JPMorgan has demanded higher monthly

15   payments than it should have been permitted to demand since acquiring the loans.

16       42.    At an April 13, 2010 hearing before the House Financial Services

17   Committee, David Lowman, the CEO for Home Lending at JPMorgan declared

18   "Like all loans, mortgage contracts are based on a promise to repay money

19   borrowed." But JPMorgan is improperly demanding that Option ARM borrowers

20   pay *more* than they borrowed. The mortgage contracts here at issue simply do not

21   permit JPMorgan to make that demand, as borrowers' monthly mortgage payments

22   were required to be applied to both principal and interest each month, with all

23   interest being satisfied before principal.

24       43.    JPMorgan's reasons for engaging in this misconduct are clear and

25   entirely self-interested. By improperly inflating borrowers' mortgage loan

26   balances, JPMorgan can inflate the asserted value of the assets in its balance sheet.

27   For accounting purposes, JPMorgan values loans at their current principal balance

28   until borrowers are 150 days or more delinquent on their payments. Even after a

1   loan becomes 150 days delinquent and JPMorgan values that loan at its "current fair
2   market value," the higher the stated principal balance, the greater the value
3   JPMorgan assigns to the loan. Thus, by inflating the asserted principal balance on
4   borrowers' loans, JPMorgan also inflates the value of its assets as reflected on
5   balance sheets made available to investors.

6        44.    In addition, JPMorgan has discovered, paradoxically, that borrowers
7   are more likely to make their monthly mortgage payments if the principal balance
8   JPMorgan asserts is due on the loan substantially exceeds the value of those
9   borrowers' homes. According to Lowman, JPMorgan "see[s] better performance in
10   loans in the over 120% LTV [Loan To Value] band than the 90-120% band." In
11   other words, JPMorgan has concluded that it can maximize the likelihood that it
12   will collect on its loans (and thereby maximize its profits) by inflating borrowers'
13   loan balances so that they vastly exceed the value of the home on which the
14   mortgages were issued.

15        45.    Statistical data collected by JPMorgan has convinced JPMorgan that,
16   up to a point, it can inflate borrowers' principal balances without increasing the rate
17   of mortgage defaults. More than 70% of borrowers whose asserted loan balance
18   has been inflated by JPMorgan so that it exceeds the value of their home
19   nevertheless remain current on their monthly mortgage payments. JPMorgan
20   knows that this is because it is important to borrowers to protect their credit ratings,
21   and defaulting on a home mortgage loan negatively impacts credit ratings. Indeed,
22   JPMorgan has discovered that borrowers generally do not even begin to fall behind
23   on their payments until their asserted loan balances exceed 110% of the value of
24   their homes. In most cases, because most of the Option ARM loans in JPMorgan's
25   portfolio were originally issued with principal balances well below the value of the
26   homes on which they were issued, JPMorgan is able to inflate the stated principal
27   balances on those loans by a substantial amount before reaching this 110%
28   threshold.

262614_1.DOC

11

46. Plaintiffs and the Class have been and continue to be damaged by JPMorgan's breaches of contract and other misconduct.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure, Rules 23(a) and 23(b). The Class that Plaintiffs seek to represent are defined as follows:

> All individuals who, within the four-year period preceding the filing of Plaintiffs' original complaint through the date that notice is mailed, obtained an Option ARM loan on their home located in the State of California or on their home located outside the State of California where the loan was approved in or disseminated from California, where that loan has been owned or serviced by JPMorgan Chase Bank, N.A. and has the following characteristics: (i) the Note and/or TILDS identify Washington Mutual Bank as the creditor or lender, (ii) the Note identifies a "yearly" interest rate of between 1 and 3%, (iii) the Note identifies a payment amount that is fully amortizing at the identified 1-3% "yearly" interest rate, (iv) the Note identifies a "payment cap" of between 7 and 10%, and (v) the Note states, "I will pay principal and interest by making payments every month." Excluded from the Class are JPMorgan Chase's employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

48. Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate

262614_1.DOC

12

1  sub-Classes in response to facts learned through discovery or legal arguments

2  advanced by Defendants or otherwise.

3      49.    Numerosity:  The Class is so numerous that the individual joinder of

4  all members thereof is impracticable under the circumstances of this case.  While

5  the exact number of Class members is unknown at this time, Plaintiffs are informed

6  and believe that the proposed Class consists of thousands of members.

7      50.    Commonality:  Common questions of law or fact are shared by Class

8  Members.  This action is suitable for class treatment, because these common

9  questions of fact and law predominate over any individual issues.  Such common

10 questions include, but are not limited to, the following:

11         a.     Whether the "Master Loan Application" constituted an offer to

12 contract;

13         b.     Whether Washington Mutual accepted the contract terms

14 identified in the "Master Loan Application" by returning a Note reflecting

15 those same terms, and whether JPMorgan assumed those terms when it

16 acquired Washington Mutual;

17         c.     Whether the parties' contracts require borrowers' payments to be

18 applied to both principal and interest on a fully amortizing basis;

19         d.     The meaning and effect of the mutual promises in the Note,

20 Adjustable Rate Rider, and Master Loan Application;

21         e.     Whether Plaintiffs and Class Members are entitled to damages;

22         f.     The Methodology for calculating damages; and

23         g.     Whether Washington Mutual's affirmative defenses, if any, raise

24 common issues of fact or law as to Plaintiffs and Class Members as a whole.

25     51.    Typicality:  Plaintiffs' claims are typical of the claims of absent Class

26 Members.  Plaintiffs and the other Class members were subjected to the same kind

27 of unlawful conduct and the claims of Plaintiffs and the other Class members are

28 based on the same legal theories.

262614_1.DOC                                    13

52.     Adequacy:  Plaintiffs are adequate representatives of the Classes,
because their interests do not conflict with the interests of the other members of the
Classes Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and
experienced in complex class action litigation and Plaintiffs intend on prosecuting
this action vigorously.   The interests of Class Members will be fairly and
adequately protected by Plaintiffs and their counsel.

53.     Ascertainable Class:  The proposed Class is ascertainable in that the
members can be identified and located using information contained in Defendants'
mortgage lending records.

54.     This case is brought and can be maintained as a class action under
Rule 23(b)(1), 23(b)(2), and 23(b)(3):

   a.     Injunctive and/or Declaratory Relief to the Class is Appropriate:
JPMorgan has acted or refused to act on grounds generally applicable to each
of the Classes, thereby making final injunctive relief or corresponding
declaratory relief with respect to each class as a whole appropriate; and

   b.     Predominant Questions of Law or Fact:  Questions of law or fact
common to all Class members, including those identified above, predominate
over questions affecting only individual Class members (if any), and a class
action is superior to other available methods for the fair and efficient
adjudication of the controversy.  Class action treatment will allow a large
number of similarly situated consumers to prosecute their common claims in
a single forum, simultaneously, efficiently, and without the unnecessary
duplication of effort and expense that numerous individual actions would
require.  Moreover, absent class treatment of this controversy, the amount of
individual Class members' losses in comparison to the enormous cost of
litigation makes it almost certain that few Class members would ever be able
to even seek, let alone obtain, redress for their injuries.

c.   JPMorgan's Conduct Is Applicable to the Entire Class:

JPMorgan's conduct at issue in this action is the same as to all Class members. As a result, final injunctive and/or declaratory relief as to the Class as a whole is appropriate.

## FIRST CAUSE OF ACTION

### (Violation Of The UCL, Cal. Bus. & Prof. Code §§17200 et seq., "Unfair" and "Unlawful" Business Acts or Practices)

55.   Plaintiffs reallege and incorporate the allegations contained in the paragraphs above as though fully set forth herein.

56.   When JPMorgan purchased Plaintiffs' loans from the Receiver, it knew of Washington Mutual's aforementioned conduct and knew that conduct was unfair, improper and unlawful. JPMorgan knew, *inter alia*, that Washington Mutual: (i) misapplied Plaintiffs' monthly payments by applying them only to a portion of the monthly interest accrued and to no principal, (ii) unjustly inflated Plaintiffs' principal balances, (iii) failed to honor the promised interest rate, and (iv) wrongly treated Plaintiffs' loans as negative amortization loans.

57.   Despite knowing of this unfair and misleading conduct by Washington Mutual, JPMorgan has enforced Plaintiffs' loans in precisely the same unfair manner, and continues to claim the benefits of that prior unfair, unlawful, and fraudulent conduct by, *inter alia*, asserting higher principal balances and interest rates than should actually exist on the loans.

58.   Thus, JPMorgan has and continues to (i) misapply Plaintiffs' monthly payments, (ii) unjustly inflate Plaintiffs' principal balances, (iii) fail to honor the promised low interest rate, and (iv) wrongly treat Plaintiffs' loans as negative amortization loans.

59.     Through its unfair conduct, JPMorgan has unfairly increased its equity in Plaintiffs' homes, unfairly inflated Plaintiffs' principal balances and unfairly caused (or is about to cause) Plaintiffs' monthly payments to skyrocket.

60.     Therefore, Plaintiffs are direct victims of the JPMorgan's unfair business practices, and each has suffered injury in fact, and has lost money or property as a result of JPMorgan's unfair competition.

A.     **Unfair and/or Unlawful Acts or Practice (Knowing Unjust Enrichment)**

61.     Washington Mutual's misapplication of monthly payments and failure to honor the promised interest rate have been of great benefit to JPMorgan because they: (i) provided JPMorgan with a larger equity stake in Plaintiffs' homes than they otherwise would have had, (ii) inflated Plaintiffs' principal, (iii) allowed JPMorgan to demand a larger amount in payments from Plaintiffs than JPMorgan otherwise would have been able to demand.

62.     Despite knowing that Washington Mutual *mis*applied Plaintiffs' monthly payments and failed to honor the promised interest rate, after purchasing Plaintiffs' and Class members' loans, JPMorgan unfairly and unjustly recorded in its own books and records inflated and false principal balances.

63.     In addition, since acquiring the subject loans, JPMorgan has knowingly misapplied Plaintiffs' monthly payments and has failed to honor the promised interest rate. As such, JPMorgan has benefited by, *inter alia*, obtaining a larger equity stake in Plaintiffs' homes, inflating Plaintiffs' principal balance, and allowing it to demand exorbitant payments from Plaintiffs. JPMorgan has knowingly retained these benefits at Plaintiffs' expense.

64.     As a result, Plaintiffs are direct victims of JPMorgan's unfair business practices, and each has suffered injury in fact, and have lost money or property as a result of JPMorgan's unfair competition.

1   **B.    Unlawful Acts or Practices (Breach of Contract)**

2   65.    JPMorgan violated Business and Professions Code §17200, et seq. by

3   breaching its contractual obligations to Plaintiffs and the Class, as alleged below.

4   66.    Plaintiffs and Class members are direct victims of JPMorgan's

5   unlawful conduct, as alleged herein, and each suffered injury in fact, and have lost

6   money or property as a result of JPMorgan's acts of unfair competition.

7   **C.    Unfair Acts or Practices (Asserting Contractual Right JPMorgan Does**

8   **Not Have)**

9   67.    Pursuant to the Notes and the servicing rights and obligations that it

10   acquired, JPMorgan has an obligation to apply each of Plaintiffs' and Class

11   members' monthly payments based on the payment schedule in the TILDS to all

12   monthly interest accrued and a portion of principal.

13   68.    JPMorgan does not have a contractual right to apply Plaintiffs'

14   monthly payments based on the payment schedule in the TILDS to only a portion of

15   the monthly interest accrued and to no principal.

16   69.    Nevertheless, JPMorgan has asserted that it has a contractual right to

17   apply Plaintiffs' monthly payments based on the payment schedule in the TILDS to

18   only a portion of the monthly interest accrued and to no principal, and, in fact, has

19   applied Plaintiffs' payments accordingly.

20   70.    Plaintiffs and Class members are direct victims of JPMorgan's unfair

21   conduct, as alleged herein, and each suffered injury in fact, and have lost money or

22   property as a result of JPMorgan's acts of unfair competition.

23   71.    Plaintiffs bring this cause of action on behalf of themselves, on behalf

24   of the Class Members, and in their capacity as private attorneys general against all

25   Defendants for their unlawful, unfair, fraudulent and/or deceptive business acts

26   and/or practices pursuant to the California Business & Professions Code section

27   17200 *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent

28   business acts and/or practices.

262614_1.DOC                                   17

72.     Plaintiffs assert these claims as they are representatives of an aggrieved group and as  private attorneys general on behalf of the general public and other persons who have expended funds that the JPMorgan should be required to pay or reimburse under the restitutionary remedy provided by California Business & Professions Code §§ 17200, *et seq.*

73.     Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage over their competitors.

**D.     Unfair Acts Or Practices**

74.     JPMorgan's misconduct as alleged herein was unfair because (i) it caused Plaintiffs and Class Members substantial injury by, among other things, causing them to lose equity in their homes, and (ii) there were absolutely no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury.

75.     The harm to Plaintiffs, members of the general public and Class Members outweighs the utility of JPMorgan's and Washington Mutual's policies, acts and/or practices, and consequently their conduct herein constitutes an unfair business act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq.*  The misconduct alleged herein gave also JPMorgan an unfair competitive advantage over its competitors that did not engage in similar conduct.

**SECOND CAUSE OF ACTION**

**(Breach of Contract)**

76.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

77.     Plaintiffs entered into written home loan agreements with Washington Mutual, which JPMorgan subsequently purchased.

262614_1.DOC                                18

78.     JPMorgan also is the "servicer" on those loans, having purchased all servicing rights and obligations related to them that were owned by Washington Mutual.

79.     As the servicer and owner of these Option ARM loans, JPMorgan has the right to collect Plaintiffs' monthly payments, to earn a fee for accounting for those payments, and to earn interest on the loans.

80.     As the servicer and owner of these Option ARM loans, JPMorgan has the obligation to apply Plaintiffs' monthly payments as agreed in the Note.  Thus, JPMorgan is obligated to apply each monthly payment based upon the payment schedule in the TILDS to all monthly interest and a portion of principal.  In addition, JPMorgan is obligated to honor the agreed upon 1% to 3% interest rate for the initial term of Plaintiffs' loans.

81.     When JPMorgan purchased Plaintiffs' Notes and undertook the servicing obligations for Plaintiffs' Option ARM loans, JPMorgan accepted and obligated itself to all of the Note's terms.

82.     Since acquiring Plaintiffs' loans, JPMorgan has breached its obligations by applying each of Plaintiffs' monthly payments to only a portion of the monthly interest and to no principal.  Similarly, since acquiring Plaintiffs' loans, JPMorgan has breached its obligations by refusing to honor the promised low interest rate.

83.     Plaintiffs, on the other hand, have fulfilled their obligations, having made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule.

84.     As a result of these breaches of the agreement, Plaintiffs and the Class members have suffered harm.  Plaintiffs and Class members have incurred additional charges to their principal loan balance.  Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal

262614_1.DOC

1   loan balance.  Furthermore, JPMorgan's breach has placed Plaintiffs and the Class

2   members in danger of losing their homes through foreclosure as JPMorgan now

3   claims that Plaintiffs' and the Class members' principal loan balances have

4   increased and, by doing so, has limited these consumers' ability to make their future

5   house payments or obtain alternative home loan financing.

6       85.    WHEREFORE, Plaintiffs and members of the Class are entitled to

7   declaratory relief, compensatory damages proximately caused by Defendants'

8   breach of contract as alleged herein, pre-judgment interest, costs of suit and other

9   relief as the Court deems just and proper.

10

11                     **THIRD CAUSE OF ACTION**

12                        **(Unjust Enrichment)**

13      86.    Plaintiffs incorporate all preceding paragraphs as though fully set forth

14   herein.

15      87.    At the time JPMorgan purchased Plaintiffs' loans, it knew Washington

16   Mutual had been applying Plaintiffs' monthly payments in an improper manner by

17   attributing each payment to only a portion of the monthly interest and to no

18   principal.  JPMorgan also knew that Washington Mutual had failed to honor the

19   promised interest rate.

20      88.    This misconduct was of great benefit to JPMorgan because it:  (i)

21   provided JPMorgan with a larger equity stake in Plaintiffs' homes than they

22   otherwise would have had, and (2) increased Plaintiffs' principal thereby allowing

23   JPMorgan to demand a larger amount in payments from Plaintiffs than JPMorgan

24   otherwise would have been able to demand.

25      89.    Yet, after purchasing Plaintiffs' loans, JPMorgan has not corrected

26   these misapplications of payments and inflated interest charges, but instead has

27   unjustly retained the benefit from them at Plaintiffs' expense.

28

262614_1.DOC                               20

1   90.   Further, after purchasing Plaintiffs' loans, JPMorgan has also

2   knowingly misapplied Plaintiffs' monthly payments by applying them to only a

3   portion of interest accrued for each month and to no principal.  JPMorgan has also

4   knowingly failed to apply the promised interest rate.

5   91.   As a result, JPMorgan has obtained the benefit of increased equity in

6   Plaintiffs' homes.  JPMorgan has also obtained benefits associated with increasing

7   Plaintiffs' principal balance, which has allowed JPMorgan to demand a larger

8   amount in payments from Plaintiffs than JPMorgan otherwise would have been able

9   to demand.  Nevertheless, JPMorgan has unjustly retained the benefit of this

10  conduct at Plaintiffs' expense.

11

12                    **FOURTH CAUSE OF ACTION**

13                     **(Declaratory Judgment)**

14  92.   Plaintiffs reallege and incorporate the allegations contained in the

15  paragraphs above as though fully set forth herein.

16  93.   As described above, Washington Mutual was required to apply each of

17  Plaintiffs' monthly payments based on the payment schedule in the TILDS to all

18  interest accrued each month and to a portion of principal, but did not.  Washington

19  Mutual was also required to honor the promised low interest rate.

20  94.   Likewise, since purchasing Plaintiffs' loans, JPMorgan has been

21  required to apply each of Plaintiffs' past, present and future monthly payments

22  based on the payment schedule in the TILDS to all interest accrued each month and

23  to a portion of principal, but, thus far, has not.  JPMorgan was also required to

24  honor the promised low interest rate.

25  95.   On information and belief, at the time JPMorgan purchased Plaintiffs'

26  and Class members' loans, it knew that, *inter alia*:  (i) Washington Mutual had

27  misapplied Plaintiffs' monthly payments, (ii) Washington Mutual had failed to

28  honor the promised interest rate in the past, (iii) Washington Mutual and JPMorgan

262614_1.DOC                           21

1 | were required to apply each of Plaintiffs' monthly payments based on the payment

2 | schedule in the TILDS to all interest accrued each month and to a portion of

3 | principal, and (iv) Washington Mutual and JPMorgan were required to honor the

4 | promised interest rate.

5 |     96.    By the express terms of the P&A Agreement, JPMorgan purchased

6 | Plaintiffs' loans, Notes and the servicing rights and obligations for those loans. As

7 | a result, JPMorgan acquired privity with Plaintiffs.

8 |     97.    Also, under California Civil Code § 1589, JPMorgan consented to all

9 | of the obligations for Plaintiffs' and Class members' loans because it accepted the

10 | benefit of Plaintiffs' and Class members' loans.

11 |     98.    Similarly, pursuant to California Civil Code § 1459 and Code of Civil

12 | Procedure § 368, JP Morgan is the subsequent purchasers and/or assignees of

13 | Plaintiffs' loans. The subject Option ARM loans are non-negotiable instruments

14 | within the meaning of Civil Code § 1459 and at all times relevant, JP Morgan

15 | purchased, packaged, securitized and/or sold the subject Option ARM loans with

16 | full knowledge of the failures to disclose and material omissions as alleged herein.

17 | JP Morgan therefore stands in the shoes of the Receiver, as the seller and assignor,

18 | taking the Receiver's rights and remedies, *subject to any defenses that the obligor*

19 | *(Plaintiffs)* have against the assignor prior to notice of the assignment.

20 |     99.    Plaintiffs have been (and will continue to be) harmed by JPMorgan's

21 | failure to adjust Plaintiffs' principal balance to reflect that all monthly payments

22 | based on the payment schedule – whether made to Washington Mutual or

23 | JPMorgan – have been applied to all interest accrued each month and a portion of

24 | principal.

25 |     100.   Plaintiffs also will suffer further injury if JPMorgan continues the

26 | practice of applying payments based on the payment schedule to only a portion of

27 | interest accrued each month and to no principal.

28 |

CLASS ACTION COMPLAINT

101.   Plaintiffs have been (and will continue to be) injured by JPMorgan's failure to correct the interest charges by Washington Mutual that were based on a rate higher than the promised interest rate.

102.   Plaintiffs also will suffer further injury if JPMorgan continues to refuse to honor the promised low interest rate.

103.   Therefore, Plaintiffs and the Class members are entitled to a declaration that:  (i) no negative amortization may occur for any month in which a borrower has made or makes a monthly payment that is equal to or greater than the monthly payment listed on the payment schedule in the TILDS, (ii) each past, present and future monthly payment based on the payment schedule in the TILDS must be applied to all interest accrued for each month and to a portion of principal, (iii) each borrower's principal balance must reflect that past, present and future monthly payments based on the payment schedule in the TILDS have been applied to all interest accrued each month and to a portion of principal, (iv) the interest charged must be reduced to reflect charges based on the promised interest rate, and (v) the promised low interest rate must be honored.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all Class members pray for judgment against JPMorgan as follows:

1.   For a declaration that:  (i) no negative amortization may occur for any month in which a borrower has made or makes a monthly payment that is equal to or greater than the monthly payment listed on the payment schedule in the TILDS, (ii) each past, present and future monthly payment based on the payment schedule in the TILDS must be applied to all interest accrued for each month and to a portion of principal, (iii) each borrower's principal balance must reflect that past, present and future monthly payments based on the payment schedule in the TILDS have been applied to all interest accrued each month and to a portion of principal, (iv) the

262614_1.DOC

23

1   interest charged must be reduced to reflect charges based on the promised interest

2   rate, and (v) the promised low interest rate must be honored.

3       2.    For actual damages according to proof;

4       3.    For compensatory damages where appropriate;

5       4.    For consequential damages where appropriate;

6       5.    For reformation;

7       6.    For specific performance;

8       7.    For injunctive relief;

9       8.    For restitution of all monies paid to or collected by JPMorgan in

10   connection with the transactions addressed herein;

11       9.    For reasonable attorneys' fees and costs;

12       10.    For imposition of a constructive trust;

13       11.    For an order certifying this case as class action and appointing

14   Plaintiffs and their counsel to represent the Class;

15       12.    For equitable relief, including restitution; and

16       13.    For such other relief as is just and proper.

17

18

19

20

21

22

23

24

25

26

27

28

262614_1.DOC

CLASS ACTION COMPLAINT

1

Dated:  November 15, 2010

2

BROWNE WOODS GEORGE LLP
Eric M. George
Michael A. Bowse

3

4

SMOGER & ASSOCIATES
Gerson H. Smoger
Steven M. Bronson

5

6

ARBOGAST & BERNS
David M. Arbogast
Jeffrey K. Berns

7

8

ANDRUS ANDERSON LLP
Jennie Lee Anderson
Lori E. Andrus

9

10

By_____
Michael A. Bowse

11

12

BROWNE WOODS GEORGE LLP
Lee A. Weiss
lweiss@bwgfirm.com
1 Liberty Plaza, Suite 2329
New York, New York 10006
Tel 212.354.4901 -- Fax 212.354.4904

13

14

15

Attorneys for Plaintiff  Laura Lyons and Elaine
Ruth Lee, on behalf of herself and all others
similarly situated

16

17

18

19

20

21

22

23

24

25

26

27

28

262614_1.DOC

25

CLASS ACTION COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

3          Plaintiffs hereby respectfully demand a jury trial.

4

5   Dated:  November 15, 2010          BROWNE WOODS GEORGE LLP
                                             Eric M. George
6                                            Michael A. Bowse

7                                       SMOGER & ASSOCIATES
                                             Gerson H. Smoger
8                                            Steven M. Bronson

9                                       ARBOGAST & BERNS
                                             David M. Arbogast
10                                           Jeffrey K. Berns

11                                      ANDRUS ANDERSON LLP
                                             Jennie Lee Anderson
12                                           Lori E. Andrus

13
                                        By
14                                            Michael A. Bowse

15                                      BROWNE WOODS GEORGE LLP
                                        Lee A. Weiss
16                                      lweiss@bwgfirm.com
                                        1 Liberty Plaza, Suite 2329
17                                      New York, New York 10006
                                        Tel 212.354.4901 -- Fax 212.354.4904
18
                                        Attorneys for Plaintiffs Laura B. Lyons and
19                                      Elaine Ruth Lee, on behalf of themselves and all
                                        others similarly situated
20

21

22

23

24

25

26

27

28

262614_1.DOC                            26

# EXHIBIT 1

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

03-9184-068906152-1

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __918,750.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

_____March 9, 2005_____          _____OAKLAND_____  ___California___
                                              (City)                          (State)

_____6011 ROCKRIDGE BLVD, OAKLAND, CA 94618_____
                        (Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __735,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___Washington Mutual Bank, FA___ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __5.421__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.650__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on __May, 2005__ , I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __April 1, 2035__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __2,589.87__ , unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                    Page 1 of 6

27          EXHIBIT |

03-9184-068906152-1

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st___ day of ___May, 2005___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Three & Twenty-Five-Hundredths___ percentage points __3.250__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Ten & Sixty-Six-Hundredths___ percentage points __10.660__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___May 1, 2006___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

03-9184-068906152-1

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on   the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to  __125%__  of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the  __FIFTH__  anniversary of the due date of the first monthly payment, and on that same day every  __FIFTH__  year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge.  The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount

29

03-9184-068906152-1

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees:  I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn.  The current fee is $ __15.00__ .  Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __Fifteen__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__ % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once of each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32889 (11-01)

Page 4 of 6

30

03-9184-068906152-1

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

31

03-9184-068906152-1

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

STATE OF Arizona } ss.
COUNTY OF Maricopa }

This instrument was acknowledged before me this 14th day of March 2005 by Laura B. Lyons in witness whereof I herewith set my hand and official seal.

Serena Alvarez _____ NOTARY PUBLIC

SERENA ALVAREZ
Notary Public - Arizona
Maricopa County
My Comm. Expires Oct 19, 2008

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

x _Laura B Lyons_____

LAURA B LYONS

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK, FA
By _Michele Mulholand_
MICHELE MULLHOLAND
VICE PRESIDENT

## Prepayment Fee Note Addendum

03-9184-068906152-1

This Note Addendum is made this ___9th___ day of _____March, 2005_____ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____Washington Mutual Bank, FA_____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the Note, the Prepayment Fee shall be equal to ___TWO___ percent ( _2.000_ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

4387 (08-01)                           Page 1 of 2

03-9184-068906152-1

**NOTICE TO THE BORROWER**
      Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.

      By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

x _Laura B. Lyons_____
   LAURA B LYONS

34

 **Washington Mutual** 1, 3, 6, 12, 36 (Flex 3) and 60 (Flex 5) MONTH MTA OPTION ARMs,
Effective December 2004

## ADJUSTABLE RATE MORTGAGE
## LOAN DISCLOSURE STATEMENT

03-9184-068906152-1

You are considering an Adjustable Rate Mortgage Loan (referred to as an "ARM") from Washington Mutual Bank, PA (the "Lender"). This disclosure describes the features of the 1, 3, 6, 12, 36 (Flex 3) and 60 (Flex 5) Month MTA Option ARM, each with 15, 30, and 40 year amortized terms. Information on other ARM programs is available upon request.

**FEATURES THAT APPLY TO ALL LOAN PROGRAMS**

This section contains terms applicable to all of the MTA Option ARM programs covered by this Loan Disclosure Statement ("Disclosure"), except as specifically noted otherwise. The subsequent sections present the terms unique to each loan program.

**NON-STANDARD LOANS**
The Non-standard loan program is a loan program for applications that do not meet the Lender's standard criteria. The interest rate for non-standard loans is usually higher than it is for standard loans. Ask us if your application will be considered under this program.

**HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED**
Your interest rate and monthly payment amount may vary as described below.

Your initial interest Rate on your loan will be disclosed to you prior to the time you obligate yourself to repay the loan. Your interest rate generally will be based on an Index (the "Index") plus a fixed amount of percentage points (the "Margin"), although certain MTA Option ARM programs will have an initial interest Rate that is not based on the Index and Margin. The initial interest Rate for the Fully-Indexed MTA Option ARM will be based on the Index described in the section below entitled "How Your interest Rate and Monthly Payments Can Change" plus a Margin. Ask us about our current Margin.

Your initial interest rate may be an amount which is lower than the sum of the Margin plus the Index published. (This is called a "Discounted Rate".) If your initial interest Rate is a discounted rate, at the first interest rate adjustment your rate may increase even if the Index remains the same or decreases. There is a possibility that your initial interest Rate may be an amount, which is higher than the sum of the Margin plus the Index. (This is called a "Premium Rate".) If your initial interest Rate is a Premium Rate, at the first interest rate adjustment, your rate may decrease even if the Index remains the same or increases. Ask us for the amount of our current interest rates, discounts, premiums and Margins. The time period for which the initial interest Rate will apply is described below in the section applicable to the specific MTA Option ARM program you select.

Your initial monthly payment amount will be established by calculating the amount necessary to pay the loan off in full (principal and interest) at the maturity date in substantially equal installments of principal and interest, based on the loan balance, term, and the initial interest Rate in effect at the time of loan closing and assuming that such interest rate will remain in effect throughout the loan term.

**HOW YOUR INTEREST RATE AND MONTHLY PAYMENTS CAN CHANGE**
The interest rate and monthly payments following the initial interest Rate and initial monthly payments will be set as described below and in the section of this Disclosure applicable to the specific MTA Option ARM program you select.

**a. Change Dates:** Each day on which your interest rate could change is called the Interest Rate Change Date. Each day on which your monthly payment may change is called the Payment Change Date. The interest Rate Change Date and the Payment Change Date for each program are described in the section of this Disclosure applicable to the specific MTA Option ARM program you select.

**b. Index:** The interest rate will be based on the Index plus a Margin. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. This information may be available in your library, or you may write to the Federal Reserve Board, Board of Governors, Publications Services, Washington, D.C. 20551.

The most recent Index figure available as of 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Lender or other Note Holder will choose a new Index and a new Margin to result in a rate similar to the rate in effect at that time which is based upon comparable information. The Note Holder will give you notice of this choice.

**c. Calculation of Interest Rate:** The Lender will calculate your interest rate changes by adding a Margin to the Current Index as of each Interest Rate Change Date. The Lender will then round this sum to the nearest one-thousandth of one percent (.001%). The Margin will be disclosed to you in your Note. Ask us about our current Margin and interest rate.

**d. The limitation on increases to your interest rate** over the term of the loan, the "Lifetime Interest Rate Cap", will be set at an amount in the following range: 8.950% to 11.950%. Ask us about our current Lifetime Cap for your loan program. There are no limits on decreases to your interest rate. However the minimum interest rate will never fall below the Margin disclosed in your Note.

**e. Increase in Principal Balance (Negative Amortization):** The principal balance on your loan can increase even though you are making the required monthly payments. This is called "negative amortization". This can happen if, as a result of adjustments in the interest rate, the required monthly payment is insufficient to pay the amount of the interest that is then due. In that event, the accrued but unpaid interest that is not included as part of the monthly payment will be added each month to the principal balance of the loan and will accrue interest at the interest rate that is in effect during that month.

If your monthly payment is not sufficient to pay monthly interest, you may take advantage of the negative amortization feature by letting the interest defer and become part of the principal balance to be paid by future monthly payments, or you may also choose to limit any negative amortization by increasing the amount of your monthly payment or by paying any deferred interest in a lump sum at any time. Ask us about the payment options available for these loan programs.

**f. Calculation of Monthly Payment:** The monthly payment amount will be established by calculating the amount necessary to pay the loan off (principal and interest) at the maturity date in substantially equal installments of principal and interest, based on the projected outstanding principal balance of your loan, the remaining term, and the interest rate in effect 45 days prior to the Payment Change Date on the assumption that the interest rate used to calculate your payment will remain in effect throughout the remaining loan term. However, there is a 7-1/2% limit to the increase or decrease in the payment change over the previous payment, except at the fifth anniversary of the due date of the first monthly payment (or at the tenth anniversary of the due date of the first monthly payment in the case of a 60 (Flex 5) Month MTA Option ARM or Fixed-Pay 120 MTA Option ARM), and on the same date every fifth year thereafter, when no limit will be applied.

Additionally, if your loan balance would otherwise exceed 125% of the original loan balance, the monthly payments immediately will be adjusted to fully amortize the loan over the then remaining life of the loan, at the interest rate in substantially equal payments, without regard to the 7-1/2% payment increase limitation (the "125% Principal Balance Limitation") and whether or not your monthly payment is otherwise scheduled to change. This payment amount will be in effect until the next regularly scheduled Payment Change Date, subject to the 125% Principal Balance Limitation.

Since the interest rate changes more frequently than the payments change, the loan may be paid in full sooner than expected if the interest rate decreases substantially, or an extra amount may have to be paid at the end if the interest rate rises substantially during the last few years of the loan term.

**g. Notice of Interest Rate and Payment Adjustments:** The Lender will send you notice of an interest rate adjustment at least once each year and a notice of each change in the monthly payment amount at least 25 days before the effective date of the payment change. The notice will be addressed to you at the property address in the Note or at the address shown in the Lender's records if you have notified the Lender of an address change. The notice will include information about your Index values, interest rates, payment amount and loan balance.

**Prepayments:** Certain options may require a prepayment fee. Ask your Loan Consultant for additional information. A partial prepayment will not change your monthly payment amount unless the Lender agrees to do so. However, a partial prepayment may reduce the amount of your monthly payments after the first Payment Change Date following your partial prepayment.

3121 (12-04)

## 1 Month MTA Option ARM

**Please Read Carefully:** General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

**a. Interest Rate Changes:** The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your first monthly payment. On the first Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each such date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Notwithstanding the above and the interest rate change provisions set forth in this Disclosure, any interest due prior to the first day of the calendar month that immediately precedes the first payment due date ("Prepaid Interest") will be the higher of the Current Index plus the Margin or the Initial Interest Rate.

**b. Payment Changes:** Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

**c. Example of a Discounted Loan Program:** *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 1.000% (equal to the 10/04 Index of 1.522% plus a 2.350% Margin, minus a 2.872% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 10.950 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|-----------|-----------------|-----------------|-------------------------------|-------------------------------------|
| 15 Years  | $59.85          | $177.31         | 61st                          | 2nd                                 |
| 30 Years  | $32.16          | $129.60         | 35th                          | 2nd                                 |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $59.85 = $359.10
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $32.16 = $192.96

**d. Example of a Fully Indexed Loan Program:** **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 3.872% (equal to the 10/04 Index of 1.522% plus a 2.350% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 8.078 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|-----------|-----------------|-----------------|-------------------------------|-------------------------------------|
| 15 Years  | $73.33          | $159.98         | 61st                          | 2nd                                 |
| 30 Years  | $47.01          | $129.76         | 44th                          | 2nd                                 |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $73.33 = $439.98
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $47.01 = $282.06

**e. Example of a Premium Loan Program:** ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.000% (equal to the 10/04 Index of 1.522% plus a 2.350% Margin, plus a 0.128% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.950 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|-----------|-----------------|-----------------|-------------------------------|-------------------------------------|
| 15 Years  | $73.97          | $159.13         | 61st                          | 2nd                                 |
| 30 Years  | $47.74          | $130.06         | 45th                          | 2nd                                 |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $73.97 = $443.82
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $47.74 = $286.44

## 3 Month MTA Option ARM

**Please Read Carefully:** General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

**a. Interest Rate Changes:** The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your first monthly payment. On the first Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each such date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Notwithstanding the above and the interest rate change provisions set forth in this Disclosure, any interest due prior to the first day of the calendar month that immediately precedes the first payment due date ("Prepaid Interest") will be the higher of the Current Index plus the Margin or the Initial Interest Rate.

**b. Payment Changes:** Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

**c. Example of a Discounted Loan Program:** *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 1.750% (equal to the 10/04 Index of 1.522% plus a 3.050% Margin, minus a 2.822% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 10.200 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|-----------|-----------------|-----------------|-------------------------------|-------------------------------------|
| 15 Years  | $63.21          | $166.73         | 61st                          | 4th                                 |
| 30 Years  | $35.72          | $129.20         | 39th                          | 4th                                 |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $63.21 = $379.26
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $35.72 = $214.32

2121 (12-04)

**37 Month MTA Option ARM (Continued)**

d. Example of a Fully Indexed Loan Program: **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.572% (equal to the 10/04 Index of 1.522% plus a 3.050% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.378 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $76.87 | $152.28 | 61st | 4th |
| 30 Years | $51.10 | $130.03 | 51st | 4th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $76.87 = $461.22
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $51.10 = $306.60

e. Example of a Premium Loan Program: ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.750% (equal to the 10/04 Index of 1.522% plus a 3.050% Margin, plus a 0.178% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.200 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $77.78 | $151.18 | 61st | 4th |
| 30 Years | $52.16 | $130.55 | 53rd | 4th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $77.78 = $466.68
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $52.16 = $312.96

**61 Month MTA Option ARM**

Please Read Carefully: General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

a. Interest Rate Changes: The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your sixth monthly payment. On the first Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Notwithstanding the above and the interest rate change provisions set forth in this Disclosure, any interest due prior to the first day of the calendar month that immediately precedes the first payment due date ("Prepaid Interest") will be the higher of the Current Index plus the Margin or the Initial Interest Rate.

b. Payment Changes: Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

c. Example of a Discounted Loan Program: *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.000% (equal to the 10/04 Index of 1.522% plus a 2.750% Margin, minus a 0.272% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.950 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $73.97 | $150.97 | 61st | 7th |
| 30 Years | $47.74 | $130.45 | 53rd | 7th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $73.97 = $443.82
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $47.74 = $286.44

d. Example of a Fully Indexed Loan Program: **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.272% (equal to the 10/04 Index of 1.522% plus a 2.750% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.678 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $75.34 | $149.48 | 61st | 7th |
| 30 Years | $49.32 | $130.76 | 55th | 7th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $75.34 = $452.04
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $49.32 = $295.92

e. Example of a Premium Loan Program: ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.500% (equal to the 10/04 Index of 1.522% plus a 2.750% Margin plus a 0.228% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.450 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $76.50 | $148.21 | 61st | 7th |
| 30 Years | $50.67 | $130.48 | 56th | 7th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $76.50 = $459.00
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $50.67 = $304.02

**(12) Month MTA Option ARM**

**Please Read Carefully:** General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

**a. Interest Rate Changes:** The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your twelfth monthly payment. On the first Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each such date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Notwithstanding the above and the interest rate change provisions set forth in this Disclosure, any interest due prior to the first day of the calendar month that immediately precedes the first payment due date ("Prepaid Interest") will be the higher of the Current Index plus the Margin or the Initial Interest Rate.

**b. Payment Changes:** Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

**c. Example of a Discounted Loan Program:** *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.200% (equal to the 10/04 Index of 1.522% plus a 2.950% Margin, minus a 0.272% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.750 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $74.98 | $141.03 | 61st | 13th |
| 30 Years | $48.90 | $128.67 | 61st | 13th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $74.98 = $449.88
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $48.90 = $293.40

**d. Example of a Fully Indexed Loan Program:** **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.472% (equal to the 10/04 Index of 1.522% plus a 2.950% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.478 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $76.36 | $139.83 | 61st | 13th |
| 30 Years | $50.50 | $127.58 | 61st | 13th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $76.36 = $458.16
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $50.50 = $303.00

**e. Example of a Premium Loan Program:** ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.625% (equal to the 10/04 Index of 1.522% plus a 2.950% Margin, plus a 0.153% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.325 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $77.14 | $139.14 | 61st | 13th |
| 30 Years | $51.41 | $126.96 | 61st | 13th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $77.14 = $462.84
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $51.41 = $308.46

**(36) Month MTA Option ARM (Less Than Initial Interest Rate Fixed for 36 months and rate monthly thereafter with initial payment fixed for 36 months)**

**Please Read Carefully:** General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

**a. Interest Rate Changes:** The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your 36th monthly payment. On the first Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each such date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure.

**b. Payment Changes:** Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the 3rd anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

**c. Example of a Discounted Loan Program:** *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 3.875% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, minus a 0.247% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 8.075 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $73.34 | $121.70 | 61st | 37th |
| 30 Years | $47.02 | $110.85 | 61st | 37th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

15 Year Term: $60,000 divided by $10,000 = 6; 6 x $73.34 = $440.04
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $47.02 = $282.12

3121 (12-04)

**36 Month MTA Option ARM (Ex. 4) (continued)**
**Initial Interest Rate fixed for 36 months and adjusts monthly with minimum payment for 36 months.**

d. **Example of a Fully Indexed Loan Program:** **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.122% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.828 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $74.58 | $121.83 | 61st | 37th |
| 30 Years | $48.45 | $110.69 | 61st | 37th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:
15 Year Term: $60,000 divided by $10,000 = 6; 6 x $74.58 = $447.48
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $48.45 = $290.70

e. **Example of a Premium Loan Program:** ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 5.375% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, plus a 1.253% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 6.575 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $81.05 | $121.14 | 61st | 37th |
| 30 Years | $58.00 | $109.68 | 61st | 37th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:
15 Year Term: $60,000 divided by $10,000 = 6; 6 x $81.05 = $486.30
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $58.00 = $336.00

**60 Month MTA Option ARM (Ex. 5)**
**Initial Interest Rate fixed for 60 months and adjusts monthly with minimum payment for 60 months.**

Please Read Carefully: General loan information is included on page 1 of this Loan Disclosure Statement. Information about our other programs is available upon request.

a. **Interest Rate Changes:** The Initial Interest Rate will be established by your loan documents and will be effective until your first Interest Rate Change Date, which will be the scheduled date of your 60th monthly payment. On the first "Interest Rate Change Date, and monthly on the same date each month thereafter during the loan term (each such date being an "Interest Rate Change Date" for this loan program), your interest rate may change based on the Current Index plus Margin as described in the "Features That Apply To All Loan Programs" section of this Disclosure.

b. **Payment Changes:** Your initial monthly payment amount will be established by your loan documents. Subject to the 125% Principal Balance Limitation, your initial monthly payment will be effective until your first Payment Change Date, which will be the fifth anniversary of the scheduled date of your first payment. Subject to the 125% Principal Balance Limitation, your monthly payment may change on the first Payment Change Date and annually on the same date each year thereafter during the loan term (each such date being a "Payment Change Date" for this loan program), and will be calculated as described in the "Features That Apply To All Loan Programs" section of this Disclosure. Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

c. **Example of a Discounted Loan Program:** *On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 3.875% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, minus a 0.247% discount, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 8.075 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $73.34 | $130.24 | 121st | 61st |
| 30 Years | $47.02 | $127.85 | 121st | 61st |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:
15 Year Term: $60,000 divided by $10,000 = 6; 6 x $73.34 = $440.04
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $47.02 = $282.12

d. **Example of a Fully Indexed Loan Program:** **On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 4.122% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 7.828 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $74.58 | $129.00 | 121st | 61st |
| 30 Years | $48.45 | $127.01 | 121st | 61st |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:
15 Year Term: $60,000 divided by $10,000 = 6; 6 x $74.58 = $447.48
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $48.45 = $290.70

e. **Example of a Premium Loan Program:** ***On a $10,000, 15 or 30 year loan with an Initial Interest Rate of 5.250% (equal to the 10/04 Index of 1.522% plus a 2.600% Margin, plus a 1.128% premium, rounded to the nearest 1/1000th of 1%), the maximum amount that the interest rate can rise under this program is 6.700 percentage points, to 11.950% (the Lifetime Interest Rate Cap). Your monthly payment in this example can rise as shown in the following table:

| Loan Term | Initial Payment | Maximum Payment | Month Maximum Payment Reached | Month Maximum Interest Rate Reached |
|---|---|---|---|---|
| 15 Years | $80.39 | $122.85 | 121st | 61st |
| 30 Years | $55.22 | $122.60 | 121st | 61st |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:
15 Year Term: $60,000 divided by $10,000 = 6; 6 x $80.39 = $482.34
30 Year Term: $60,000 divided by $10,000 = 6; 6 x $55.22 = $331.32

3121 (12-04)



*These examples are based on an Index in effect on 10/1/2004, and a Margin and discount we have used recently; your Index, Margin and discount may be different.  Ask us for our current interest rates, Margin and discount.

**These examples are based on an Index in effect on 10/1/2004, and a Margin we have used recently; your Index and Margin may be different.  Ask us for our current interest rates and Margin.

***These examples are based on an Index in effect on 10/1/2004, and a Margin and premium we have used recently; your Index, Margin and premium may be different.  Ask us for our current interest rates, Margin and premium.

The Initial Interest Rate, discount, premium and Margin used in these examples reflect terms recently offered by the Lender on a loan of 80% or less loan-to-value for owner-occupied properties.  The Initial Interest Rate, discount, premium and Margin may differ based on loan size, loan-to-value, occupancy status and optional features.  The Initial Interest Rate, discount, premium and Margin may also differ from the example if the borrower selects other available pricing options offered by the Lender.

**Washington Mutual Bank.FA**

## TRUTH IN LENDING DISCLOSURE STATEMENT

| CUSTOMER NAME | LOAN NUMBER | DATE |
|---|---|---|
| LAURA B LYONS | 03-9184-068906152-1 | 03/09/2005 |

PRESENT ADDRESS
6363 CHRISTIE AVENUE #1412, EMERYVILLE, CA 94608

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled | |
|---|---|---|---|---|
| 5.398% | 825,311.88 | 732,926.88 | 1,558,238.76 | |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENT | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 2,589.87 | Monthly, beginning 05-01-2005 |
| 12 | 2,784.11 | Monthly, beginning 05-01-2006 |
| 12 | 2,992.92 | Monthly, beginning 05-01-2007 |
| 12 | 3,217.39 | Monthly, beginning 05-01-2008 |
| 12 | 3,458.69 | Monthly, beginning 05-01-2009 |
| 300 | 4,592.41 | Monthly, beginning 05-01-2010 |

VARIABLE RATE: YOUR LOAN CONTAINS A VARIABLE-RATE FEATURE. DISCLOSURES ABOUT THE VARIABLE-RATE FEATURE HAVE BEEN PROVIDED TO YOU EARLIER.

SECURITY: You are giving a security interest in:
☐ the goods or property being purchased.
☒  6011 ROCKRIDGE BLVD, OAKLAND, CA 94618

FILING FEES:   28.00   Fees paid to government officials with respect to security instrument.

LATE CHARGE: If a payment is late, you will be charged   5.000 % of the payment.

ASSUMPTION: Someone buying your house ☒ can, subject to conditions and under certain circumstances ☐ cannot assume the remainder of the mortgage on the original terms.

PREPAYMENT: If you pay off early, you ☒ may ☐ may not have to pay a penalty. If you pay off early, you ☐ may ☒ may not be entitled to a refund of part of the finance charges already paid.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

e means estimate

You may obtain property insurance from anyone you want that is acceptable to   Washington Mutual Bank, FA
the "Lender").

☐ Estimated Disclosure-All numerical disclosures, except late payment disclosure, are estimates.
☒ Final Disclosure
☐ Itemization of Amount Financed attached.

I acknowledge receipt of a copy of this Disclosure Statement and have not yet signed any documents evidencing or securing this proposed loan.

*Laura B Lyons — March 14, 2005*

| LAURA B LYONS | DATE | | DATE |
|---|---|---|---|

| | DATE | | DATE |

1478 (05-02)

41

# EXHIBIT  2

**ADJUSTABLE RATE NOTE**
(12-MTA Index - Payment and Rate Caps)

03-9184-068912325-5

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __609,375.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

_____July 21, 2005_____          ____OAKLAND____  ____California____
                                          (City)              (State)

_____2346-2348 BROWNING STREET, BERKELEY, CA 94702_____
                        (Property Address)

**1. BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U.S. $ __487,500.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __Washington Mutual Bank, FA__. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2. INTEREST**
   Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __4.937__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.250__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
   **(A) Time and Place of Payments**
   I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
   I will make my monthly payments on __1st__ day of each month beginning on __September, 2005__ . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __August 1, 2035__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".
   I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

   **(B) Amount of My Initial Monthly Payments**
   Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,624.60__ , unless adjusted at an earlier time under Section 4(H) of this Note.

32869 (11-01)                          Page 1 of 6

# EXHIBIT 2

42

03-9184-068912325-5

**(C) Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may further change on the ___1st___ day of ___September, 2005___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**
On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
The most recent Index figure available as of 15 days before each Interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Two-Tenths___ percentage points ___2.200___% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**
My interest rate will never be greater than ___Nine & Ninety-Five-Hundredths___ percentage points ___9.950___% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest·rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**
Effective every year commencing ___September 1, 2006___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

43

03-9184-068912325-5

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**
   Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on  the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.
   **(H)  Limit on My Unpaid Principal; Increased Monthly Payment**
   My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that ___125%___ limitation,  I  will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.
   **(I)  Required Full Monthly Payment**
   On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).
   **(J) Notice of Changes**
   The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.
   **(K)  Failure to Make Adjustments**
   If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.
**5.  BORROWER'S RIGHT TO PREPAY**
   I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
   I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.
**6.  LOAN CHARGES**
   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan  exceed the permitted limits, then;  (a) any such loan charge shall be reduced by the amount

32899 (11-01)                              Page 3 of 6

03-9184-068912325-5

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ __15.00__ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __Fifteen__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__ % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once of each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

45

03-9184-068912325-5

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor.. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the  Note or other loan document is acceptable to  Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which  Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

46

03-9184-068912325-5

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X_____
ELAINE RUTH LEE

47

**Washington Mutual Bank.FA**

## TRUTH IN LENDING DISCLOSURE STATEMENT

| CUSTOMER NAME | LOAN NUMBER | DATE |
|---|---|---|
| ELAINE RUTH LEE , TRUSTEE | 03-9184-068912325-5 | 07/21/2005 |

PRESENT ADDRESS
2346-2348 BROWNING STREET, BERKELEY, CA 94702

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled | |
|---|---|---|---|---|
| 4.932% | 489,038.72 | 486,067.24 | 975,105.96 | |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,624.60 | Monthly, beginning 09-01-2005 |
| 12 | 1,746.45 | Monthly, beginning 09-01-2006 |
| 12 | 1,877.43 | Monthly, beginning 09-01-2007 |
| 12 | 2,018.24 | Monthly, beginning 09-01-2008 |
| 12 | 2,169.61 | Monthly, beginning 09-01-2009 |
| 300 | 2,872.90 | Monthly, beginning 09-01-2010 |

VARIABLE RATE: YOUR LOAN CONTAINS A VARIABLE-RATE FEATURE. DISCLOSURES ABOUT THE VARIABLE-RATE FEATURE HAVE BEEN PROVIDED TO YOU EARLIER.

SECURITY: You are giving a security interest in:
☐ the goods or property being purchased.
☒      2346-2348 BROWNING STREET, BERKELEY, CA 94702

FILING FEES:   28.00      Fees paid to government officials with respect to security instrument.

LATE CHARGE: If a payment is late, you will be charged    5.000 % of the payment.

ASSUMPTION: Someone buying your house   ☒ can, subject to conditions and under certain circumstances   ☐ cannot   assume the remainder of the mortgage on the original terms.

PREPAYMENT: If you pay off early, you   ☒ may   ☐ may not   have to pay a penalty. If you pay off early, you   ☐ may   ☒ may not be entitled to a refund of part of the finance charges already paid.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

e means estimate

---

You may obtain property insurance from anyone you want that is acceptable to _____ Washington Mutual Bank, FA _____
(the "Lender").

☐ Estimated Disclosure-All numerical disclosures, except late payment disclosure, are estimates.
☒ Final Disclosure
☐ Itemization of Amount Financed attached.

I acknowledge receipt of a copy of this Disclosure Statement and have not yet signed any documents evidencing or securing this proposed loan.

| | | | |
|---|---|---|---|
| ELAINE RUTH LEE , TRUSTEE | DATE | | DATE |
| | DATE | | DATE |

1475 (05-02)

48

**Prepayment Fee Note Addendum**

03-9184-068912325-5

This Note Addendum is made this ___21st___ day of _____July, 2005_____ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____Washington Mutual Bank. FA_____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

**BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the Note, the Prepayment Fee shall be equal to ___TWO___ percent ( 2.000 %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

4387 (06-01)                              Page 1 of 2

49

03-9184-068912325-5

**NOTICE TO THE BORROWER**
    Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.


    By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.


X_____
  ELAINE RUTH LEE

4287 (08-01)              ·  Page 2 of 2

So